STATE of Alaska, Petitioner,

v.

Richard F. BROWDER, Respondent-Cross-Petitioner.

No. 1323.

Supreme Court of Alaska.

July 1, 1971.

Robert L. Eastaugh, Asst. Dist. Atty., Harold W. Tobey, Dist. Atty., Anchorage, G. Kent Edwards, Atty. Gen., Juneau, for petitioner.

Robert H. Wagstaff, Boyko & Walton, Anchorage, for respondent and cross-petitioner.

Before BONEY, C. J., and DIMOND, RABINOWITZ, CONNOR, and ERWIN, JJ.

## OPINION

RABINOWITZ, Justice.

This case presents important questions concerning the constitutional rights of one accused of direct criminal contempt and the extent of our review jurisdiction in the procedural context of the case at bar.

### FACTUAL AND PROCEDURAL BACKGROUND

On March 23, 1970, at approximately 3 p. m., Judge Joseph Brewer, while presiding over municipal arraignments in the Municipal Division of the District Court, requested the bailiff to bring Richard F. Browder into the courtroom. After Browder was brought in the courtroom, he was asked his name, whether he was the person who had entered the courtroom earlier with a shotgun, and if he had engaged in such conduct what explanation, if any, he had to offer. Browder explained that he did not wish to leave his friend's shotgun in an unlocked vehicle; that he therefore unloaded the shotgun and broke it open; and that he then entered the courtroom to ascertain how long the owner of the weapon would have to remain in the courtroom. At this point in the proceeding, Judge Brewer informed Browder that his conduct could be characterized as a direct contempt of court punishable by a fine of up to $300 or 6 months' imprisonment. After reading to Browder Alaska's statutory provisions governing contempt, Judge Brewer told Browder

> that coming into the court * * * carrying a shotgun * * * even though it were broken at the breach and carrying the shells in your pocket was, sir, direct contempt of this court and is contumacious and reflects upon the authority of this court and impairs its dignity and authority and I will not have it. Under-

stand that? Furthermore a charge of contempt of court is not one to which you can plead guilty or not guilty. * * *

Browder was then sentenced to six months in the Anchorage City Jail, and remanded to the custody of the bailiff.

Thereafter, on March 31, 1970, with the assistance of counsel, Browder filed, in the superior court, a complaint for a writ of habeas corpus. On April 14, 1970, Browder additionally filed a notice of appeal from his contempt conviction and from the sentence which was imposed. In his appeal and habeas corpus action, Browder asserted that Judge Brewer, sitting as a city magistrate, lacked authority to punish for contempt since neither the charter nor the ordinances of the city of Anchorage granted him this power; that the sentence imposed exceeded the maximum permissible sentence, $300 fine or 30 days incarceration, for all crimes under the charter of the city of Anchorage; that the court's judgment was defective in that it did not contain a sufficient factual recitation showing a "legal contempt of court as is required by Civil Rule 90(a)";[1] that he was denied his right to a jury trial; and that he was not guilty of contempt as a matter of law.

The appeal and habeas corpus matters were thereafter consolidated for hearing before the superior court. In connection with the superior court proceedings, Richard Browder filed an affidavit in which he related his version of the events which culminated in his contempt conviction. According to Browder, on March 23, 1970, at approximately 1:30 p. m. he accompanied two companions to the State Court Build-ing at Anchorage, Alaska; "[t]hat upon entering the State Court Building an Alaska State Trooper directed * * * [his] companion to unload and break his shotgun. * * *" Thereafter, his companion complied with the request and they were "permitted to enter, attend, and depart the District Court that was then in session, * * * the * * * shotgun remaining at all times in the possession of [Browder's] companion." When they left, Browder and his companions drove to the Municipal Division of the District Court. Browder states that subsequent to their arrival at the Municipal Division Court building and after some delay,

he went into court * * * [and] took the above described shotgun with him, broken at the breach and unloaded, because he did not want to leave the shotgun in the truck as the truck could not be locked and he was afraid that the shotgun might be stolen,

That he entered the courtroom and went to his two companions who were sitting in approximately the third row of spectators in the court, and gave the keys to the truck to its actual owner and asked his companions how long they would be in court,

That as soon as he had completed this inquiry and turned to leave the court bailiff approached him and requested that he remove himself from the court,

That at no time while in the court did he make any loud noise, disturbance, gestures, or in any way conduct himself other than in a calm, reasonable and normal manner as any other court spectator would * * *.

1. On April 2, 1970, Judge Brewer filed, nunc pro tunc as of March 23, 1970, a certificate of contempt. The judge's certificate reads in part as follows:

I, Joseph J. Brewer, District Judge, State of Alaska, Third Judicial District, hereby certifying that the above-named defendant, Richard F. Browder entered the District Court courtroom located at Sixth Avenue and C Street, Anchorage, Alaska during the session of criminal arraignments therein on the afternoon of March 23, 1970, carrying a shot-gun open at the breach but not dismantled, and carrying shot-gun shells on his person;

That following an argument with the bailiff I directed the bailiff to remove the defendant from the premises in the interests of safety of all persons present;

That subsequently I directed the bailiff to bring the defendant back to the courtroom, minus the shot-gun * * *.

According to Browder, he then left the courtroom. Within 15 minutes, the bailiff found Browder and requested him to return to the courtroom. Upon his return, Browder was sentenced to six months' imprisonment for contempt of court.

As part of its opposition in superior court, the State of Alaska filed Judge Brewer's affidavit. In this affidavit, Judge Brewer states that:

> At sometime between 2 p. m. and 2:20 p. m., while occupied with criminal arraignments, he noticed the appearance in court of an individual carrying a shotgun, which individual was dressed in denim overalls and a leather vest, the breast pocket of which gave him the impression it contained shells for the shotgun, with 'Brothers' lettered across the back ·* * *.

Judge Brewer further says that he found Browder's appearance with the shotgun "shocking" and, because he believed the "shotgun carrier might very well start shooting up the courtroom," feared for the safety of the persons in the courtroom as well as for his own personal safety. It appeared to Judge Brewer that Browder, when approached by the bailiff, "showed some opposition to leaving although he made no threatening gestures with the shotgun * *. *." [2] The judge estimated the entire episode lasted approximately one and one-half minutes. According to Judge Brewer, "there was a disruption of the court's business and an interruption in the continuity of the arraignments" because of the unusualness of Browder's appearance and actions.

After hearing argument from counsel, Superior Court Judge Eben H. Lewis ruled that Judge Brewer acted correctly in ordering Browder's removal from the courtroom because Judge Brewer "had a reasonable and legitimate concern for the safety of himself and others present in that courtroom"; that Judge Brewer, as a district judge, possessed contempt powers; and that under Alaska's statutes pertaining to contempt, "the conduct of an individual tending to disrupt the proceedings or to impair the authority of the court must be of a willful nature." Judge Lewis also concluded, guided by the rationale of Baker v. City of Fairbanks, 471 P.2d 386 (Alaska 1970), that Browder was entitled to a jury trial on the issue of whether he willfully intended to disrupt the proceedings or impair the authority of the district court. Apparently of controlling significance to Judge Lewis in his resolution of the jury trial issue was the fact that in *Baker* this court declared that under Alaska's constitution an accused upon demand is entitled to a jury trial in any criminal prosecution, whether under state law or for violation of a city ordinance. *Baker* further defined the category of "criminal" prosecutions as "including any offense a direct penalty for which may be incarceration in a jail or

2. The state also produced an affidavit of John Michael Barbarick, a court bailiff for the District Court of the State of Alaska, Municipal Division. In his affidavit, the bailiff states that on the afternoon of March 23, 1970, "several persons known to him to be members of the Brothers Motorcycle Club" were present in the courtroom. Mr. Barbarick further states that

[d]uring criminal arraignments, an individual of thickset build, with long hair and a beard, appeared in the courtroom wearing a brown leather vest, levis, and boots, and carrying a shotgun, broken at the breach;

The shotgun carrier, who was known to affiant as another member of the Brother's Motorcycle Club, then approached the other members of that group seated in the courtroom;
* * *

Affiant told the carrier that he would have to get the shotgun out of the courtroom, and the individual replied that it was unloaded;

Judge Joseph J. Brewer * * * interrupted the arraignments to order affiant to remove that man;

At first, the individual acted as though he was going to contest being ordered to leave;

Affiant escorted the individual from the courtroom;

The incident lasted a total of one to one and one-half minutes.

penal institution." [3] By way of dictum, Judge Lewis made the observation that "it goes without saying that with that right of jury trial of course there was a right to counsel." [4] The case was then remanded to the district court for trial in accordance with Judge Lewis' decision.

The State of Alaska now petitions this court seeking review of Judge Lewis' rulings that Browder was entitled to counsel and a jury trial on the issue of whether he willfully intended to disrupt the proceedings or impair the authority of the district court. Browder has also cross-petitioned seeking review of Judge Lewis' determinations that Judge Brewer possessed the authority to punish contumacious conduct; that Judge Brewer was not limited by the maximum sentence permitted under the city of Anchorage's charter; that the order of contempt was not void on its face; and Judge Lewis' failure to hold that he was not guilty of contempt as a matter of law.

## JURISDICTION IN GENERAL

Article IV, section 1 of the Alaska Constitution provides in part that "The jurisdiction of courts shall be prescribed by law."

Pursuant to this grant of power the legislature in AS 22.05.010 delineated the jurisdiction of the Supreme Court of Alaska in the following manner:

> The supreme court has final appellate jurisdiction in all actions and proceedings. The supreme court may issue injunctions, writs of review, mandamus, certiorari, prohibition, habeas corpus, and all other writs necessary or proper to the complete exercise of its jurisdiction. * * * An appeal to the supreme court is a matter of right, except that the state shall have no right of appeal in criminal cases, except to test the sufficiency of the indictment or information and [to hear appeals on the grounds that the sentence is excessive or too lenient].

In sketching the constitutional, statutory, and regulatory scheme whereby appellate review of lower court decisions may be had, article IV, section 15 of the Alaska Constitution is also relevant. This section provides in part that:

> The supreme court shall make and promulgate rules governing the administration of all courts. It shall make and promulgate rules governing practice and procedure in civil and criminal cases in all courts.

Acting under this authorization, this court promulgated three regulatory provisions which are pertinent to the jurisdictional issue in the present case. Supreme Court Rule 6 reiterates the legislative prohibition, contained in AS 22.05.010, against the state's right to appeal in a criminal case. Rule 6 provides:

> An appeal may be taken to this court from a final judgment entered by the superior court or a judge thereof in any action or proceeding, civil or criminal, except that the state shall have a right to appeal in criminal cases only to test the sufficiency of the indictment or on the ground that the sentence is too lenient.

Exercising the grant of supervisory powers conferred by Article IV, Section 15 of the Alaska Constitution, this court promulgated Supreme Court Rule 23 which provides in part:

> An aggrieved party may petition this court for review of any order or decision of the superior court, not otherwise appealable under Rule 6, in any action or proceeding, civil or criminal, as follows:
>
> * * * * * *
>
> (c) From any order affecting a substantial right in an action or proceeding which either (1) in effect terminates the proceeding or action and prevents a final judgment therein; or (2) discontinues the action; or (3) grants a new trial.

---

3. Baker v. City of Fairbanks, 471 P.2d 386, 402 (Alaska 1970).

4. Judge Lewis concluded that since Browder now had counsel available the right to counsel was not really an issue in the case.

(d) Where such an order or decision involves a controlling question of law as to which there is substantial ground for difference of opinion, and where an immediate and present review of such order or decision may materially advance the ultimate termination of the litigation.

(e) Where postponement of review until appeal may be taken from a final judgment will result in injustice because of impairment of a legal right, or because of unnecessary delay, expense, hardship or other related factors.

Supreme Court Rule 24 makes clear that the allowance of review is discretionary and is a concomitant of this court's power of supervision and review. Rule 24 provides:

A review shall not be a matter of right, but will be granted only: (1) where the order or decision sought to be reviewed is of such substance and importance as to justify deviation from the normal appellate procedure by way of appeal and to require the immediate attention of this Court; (2) where the sound policy behind the general rule of requiring appeals to be taken only from final judgments is outweighed by the claim of the individual case that justice demands a present and immediate review of a particular non-appealable order or decision; or (3) where the superior court has so far departed from the accepted and usual course of judicial proceedings, or so far sanctioned such a departure by an inferior court or administrative tribunal, as to call for this court's power of supervision and review.

The crux of the jurisdictional problem confronting the court in this case is the apparent conflict between the prohibitions against criminal appeal by the state found in AS 22.05.010 and Supreme Court Rule 6, and the authorization of discretionary review of any order or decision of the superior court, not otherwise appealable under Rule 6, in any criminal action or proceeding provided for in Supreme Court Rules 23 and 24.

■ The key to the resolution of this conflict is for the most part to be found in provisions of AS 22.05.010. We think it significant that the legislature in prescribing this court's jurisdiction specifically provided that "The supreme court may issue injunctions, writs of review, mandamus, certiorari, prohibition, habeas corpus, and all other writs necessary or proper to the complete exercise of its jurisdiction." In our view this provision is a clear manifestation of the legislature's intent that the supreme court would be able to exercise its final appellate jurisdiction other than by appeal. This conclusion in turn necessitates consideration of the question whether these other forms of review are limited by the same restriction as appeal; that is, are they unavailable to the state in criminal cases?

■ We hold that the limitation placed upon the state's right to appeal in a criminal case, found in AS 22.05.010, was intended to apply only to instances where our jurisdiction is sought to be invoked by appeal. AS 22.05.010 clearly distinguishes between appeals and other forms of review. Appeals are specifically limited, whereas the other forms of review authorized under AS 22.05.010, by virtue of the language "all * * * writs necessary * * * to the complete exercise of * * * [the supreme court's] jurisdiction," have no limitations placed on them.

In addition to this textual-grammatical analysis of AS 22.05.010, we think that article IV, section 15 of the Alaska Constitution, and underlying policies reflected in this provision of our constitution lend support to the conclusion that the state is not barred from invoking our review jurisdiction in criminal matters.

■ Article IV, section 2 of the Alaska Constitution provides in part that "The supreme court shall be the highest court of the State, with final appellate jurisdiction."

If AS 22.05.010 is construed to prohibit this court's review of any actions challenged by the state, then a conflict would arise between article IV, section 2 of the

constitution and AS 22.05.010. Acceptance of this construction in the context of the case at bar would mean that the superior court, rather than this court, is the highest court of the state possessed of final appellate jurisdiction. This court would then be limited to reviewing only those cases where a conviction had been obtained and a defendant had appealed.[5] We believe that a construction of AS 22.05.010 which carries over the limitation on the state's right to appeal in criminal matters to other forms of review would be contrary to the intent of the framers of our constitution when they determined that the supreme court was to be the highest court of the state, and was to be vested with final appellate jurisdiction. Unless the supreme court can fully implement its final appellate jurisdiction through use of its review jurisdiction, it will be extremely difficult, if not impossible, for this court to exercise proper control over the administration of criminal justice, and the development of rules of law in criminal trials. One can envision that erroneous rulings involving important questions of constitutional law will be made during a trial, or at the superior court appellate level, in favor of the accused. How are such mistakes to be corrected? Neither AS 22.05.010 nor Alaska's constitutional prohibition against double jeopardy requires that an erroneous non-final order or decision, favorable to the accused, must stand uncorrected.[6] The answer lies in the distinction made in AS 22.05.010 between appeals and other forms of review and the placement of final appellate jurisdiction in the supreme court under article IV, section 2 of the Alaska Constitution. We therefore hold that the state can invoke our discretionary review jurisdiction in criminal cases where the matter sought to be reviewed involves a non-final order or decision of the superior court.

## JURISDICTION IN THE CASE AT BAR

■ Determination of whether we have jurisdiction in the case at bar initially involves a question of the proper characterization of the present proceeding. As was mentioned previously, the superior court reversed the district court's contempt conviction of Browder and remanded his case to the district court for a new trial. Supreme Court Rule 6 provides in part that "An appeal may be taken to this court from a final judgment entered by the superior court * * * in any action or proceeding, civil or criminal * * *." Here the requisite finality is lacking for the superior court's decision granting Browder a new trial in district court was neither a final judgment within the intendment of Rule 6 nor our precedents under this rule. *See* Patrick v. Sedwick, 387 P.2d 294 (Alaska 1963); In re Mountain View Public Utility District No. 1, 359 P.2d 951 (Alaska 1961).[7]

Since a non-final interlocutory order of the superior court is the focal point of the parties' dispute, we must next determine whether the case at bar offers an appropriate occasion to exercise our review jurisdiction. For it is established that the parties do not have a right to review, rather the grant of review lies within this court's sound discretion. City of Fairbanks v. Schaible, 352 P.2d 129 (Alaska 1960). In order to obtain review, the party must satisfy both Supreme Court Rules 23 and 24. Levi v. Sexton, 439 P.2d 423, 426 (Alaska 1968); State v. Hillstrand, 352 P.2d 633, 634 (Alaska 1960).

Supreme Court Rule 23(c) (3) provides that an aggrieved party in any criminal

---

5. Under AS 22.05.010, the state is authorized to appeal in criminal cases only to test the sufficiency of the indictment or information.

6. Lack of review might well tend to both foster and insulate judicial biases at the trial court level and superior court appellate level.

7. In Catlin v. United States, 324 U.S. 229, 233, 65 S.Ct. 631, 633, 89 L.Ed. 911, 916 (1945), the Supreme Court said a final decision generally was "one which ends the litigation * * * and leaves nothing for the court to do but execute the judgment." *See also* 9 J. Moore, Federal Practice ¶ 110.08 (2d ed. 1970).

proceeding may petition this court to review any order or decision of the superior court not otherwise appealable, which affects a substantial right and which grants a new trial.[8] In the case at bar, the superior court did in fact grant a new trial. Furthermore, we deem the state's interest in preservation of the contempt conviction and the district court's implied ruling that Browder was not entitled to a jury trial, in regard to his allegedly directly contumacious conduct, is reflective of the substantiality of the interests of the state which were affected by the rulings under which the superior court ordered a new trial.[9] In view of these factors, we conclude that the case comes within the purview of Supreme Court Rule 23(c) (3).

Our study of the matter has led us to the further conclusion that the state has also met the requirements of Supreme Court Rule 24(1).[10] We hold that the superior court's decision that in a case of direct contempt the contemnor is entitled to a jury trial, in regard to his purportedly contumacious conduct, is of such importance and substance as to justify our review of the matter. As was explained earlier, the superior court's jury trial ruling was embodied in a decision which resulted in the granting of a new trial to Browder in district court. Because of the absence of a final order under Supreme

Court Rule 6 and the limitation imposed by AS 22.05.010 upon the state's right to appeal in criminal cases, normal appellate procedures by way of appeal were unavailable to the state. In light of the importance of the superior court's ruling, the unavailability of appeal to the state, and the necessity that this court exercise its final appellate jurisdiction in regard to a ruling so crucial to the proper administration of criminal justice, we have decided that this case presents an appropriate instance for affirmative exercise of our review jurisdiction.[11]

Before leaving the subject of jurisdiction, we think it pertinent to comment upon our previous decisions in State v. Keep, 397 P. 2d 973, aff'd on rehearing, 409 P.2d 321 (Alaska 1965). There one James Benton had been acquitted by the district magistrate court. The state then petitioned the superior court for review of the judgment of acquittal, and its petition was dismissed. It then appealed the dismissal of its petition, and we affirmed the superior court's dismissal of the petition for review. The first *Keep* opinion reasoned the state was clearly barred from appealing a judgment of acquittal, so should not be permitted to petition for review because it could then accomplish indirectly what AS 22.05.010 and Supreme Court Rule 6 explicitly barred it from doing directly. Our opinion on rehearing further reasoned that since the defendant

---

8. The state relies upon subsection (d) of Supreme Ct.R. 23. Under Leege v. Strand, 384 P.2d 665 (Alaska 1963), we can look to other grounds to determine whether review should be granted.

9. *Compare* State v. Salinas, 362 P.2d 298 (Alaska 1961).

10. Supreme Ct.R. 24 provides in part:
    A review shall not be a matter of right, but will be granted only:
    (1) where the order or decision sought to be reviewed is of such substance and importance as to justify deviation from the normal appellate procedure by way of appeal and to require the immediate attention of this court. * * *

11. *Compare* Knudsen v. City of Anchorage, 358 P.2d 375 (Alaska 1960), where this court held that the superior court's denial of a jury trial affected a substantial right

of the petitioner under Supreme Ct.R. 23, and hence justified a deviation from normal appellate procedure.

In holding that the state can invoke our review jurisdiction in a criminal proceeding, and that this is an appropriate case for the exercise of our review jurisdiction, we find it unnecessary to decide whether this matter is properly before us as an appeal from a final habeas corpus judgment. Earlier we noted that Browder filed a habeas corpus action in superior court which was consolidated with his appeal from the contempt conviction. In this regard, AS 12.75.230 provides in part:

A party to a proceeding by habeas corpus may appeal from the judgment of the court refusing to allow the writ or a final judgment therein in like manner and with like effect as in an action. * * *

would be protected from conviction by the Double Jeopardy Clause, the case was moot and the defendant had no interest in contesting the state's petition for review. The case at bar is distinguishable from the circumstances of *Keep*. Here Browder was convicted of contempt in district court. A reversal of the superior court's decision granting a new trial to Browder would not place him in double jeopardy. Since Browder was convicted in the district court and obtained a reversal in the superior court, his case is not moot. This lack of mootness is reflected in the vigorous and skillful adversary presentations we have been accorded regarding the substantive and jurisdictional issues in the case at bar.[12]

## WHETHER A DIRECT CRIMINAL CONTEMNOR MAY BE SUMMARILY CONVICTED BY THE OFFENDED COURT, WITHOUT A JURY TRIAL.

In Baker v. City of Fairbanks, 471 P.2d 386, 401–402 (Alaska 1970), the Alaska Constitution was held to guarantee the right to jury trial in any criminal prosecution in which an accused could be incarcerated in a jail or penal institution. We must now decide whether Alaska's Constitution also guarantees the right to jury trial for a direct criminal contempt[13] which is punishable by a maximum sentence of six months incarceration or $300 fine.

"Contempt" originally embraced any act disrespectful to the king, whether it was an insult or disobedience to a lawful order.[14] The contempt could occur directly to the king himself, but it more likely consisted of disrespect to an agency of the king's government, and most frequently the courts.[15] Likewise, disobedience might be to an order of the king himself; more likely it was to an order of a governmental agency, especially a court or the chancellor.[16]

In its earliest form, contempt was regarded as a crime, and upon conviction was punished by the imposition of criminal sanctions.[17] One writer maintains that this was because "The original law of contempt embraced only what is now known of as criminal contempt."[18] It may also have been because every contempt inevitably contains an element of disrespect for the authority of government,[19] which has since become one of the hallmarks of criminal contempt. In any event, the genesis of modern day contempt was a crime, "which derived its criminality from the active interference with the crown or its acting official agents."[20]

The constitutional power of state and federal courts to punish summarily direct criminal contempts without a jury trial was, until fairly recent times, consistently upheld. In so doing, the cases construed the Due Process Clause, Article III and the Sixth Amendment of the Constitution of the United States as permitting

> summary trials in contempt cases because at common law contempt was tried without a jury and because the power of courts to punish for contempt without the intervention of any other agency was considered essential to the proper and

---

12. Admittedly, review will delay Browder's retrial in the district court but it was Browder who initiated the appeal process. On this record, it is not open to Browder to claim he has been denied a speedy trial or that the state is using its economic power to place Browder into a position where he will be unable to defend himself.

13. Although fine distinctions can be drawn, it is clear that the present case is one of direct contempt. Taylor v. District Court, 434 P.2d 679 (Alaska 1967).

14. Beale, Contempt of Court, Criminal and Civil, 21 Harv.L.Rev. 161 (1908).

15. *Id.* at 162.

16. *Id.* at note 14.

17. Wright, Byrne, Haakh, Westbrook & Wheat, Civil and Criminal Contempt in the Federal Courts, 17 F.R.D. 167 (1955).

18. R. Goldfarb, The Contempt Power 11–12 (1963).

19. Beale, *supra* note 14, at 171.

20. Goldfarb, *supra* note 18, at 50.

effective functioning of the courts and to the administration of justice.[21]

A consistent theme running throughout the decisions which sustained the authority of courts to punish summarily for contempt is that such power is necessary for preservation of the dignity, decorum, respect, authority, order, and effectiveness of the judicial process. The cases reflect the further belief that the courts must possess immediate means to discipline the contumacious in order to vindicate and ensure the preservation of these values.[22] A second minor rationale advanced in support of the power to dispose summarily of direct criminal contempts is that "where the court has personally observed the contemnor's misbehavior, the usual mode of proof—i. e., trial—may supposedly be dispensed with." [23]

This unique, near despotic traditional power, to impose penal sanctions upon the contemnor without the constitutional safeguards operative in other types of ordinary criminal offenses was significantly circumscribed in Bloom v. Illinois, 391 U.S. 194, 88 S.Ct. 1477, 20 L.Ed.2d 522 (1968). There a contumacious state defendant was sentenced to two years' imprisonment for criminal contempt. Justice White, speaking for the Court, held that serious criminal contempts were to be treated like any other crimes for purposes of the right to jury trial under the Due Process Clause of the Fourteenth Amendment to the United States Constitution and reversed Bloom's conviction.[24]

In *Bloom*, the Supreme Court held that serious criminal contempts are "so nearly like other serious crimes that they are subject to the jury trial provisions of the Constitution * * *." [25] It was reasoned that criminal contempt was a crime in every fundamental respect because it "is a violation of the law, a public wrong which is punishable by fine or imprisonment or both." [26] In the Supreme Court's view, cases in the nature of criminal contempt provided an even more compelling situation than presented by the ordinary criminal case for providing a right to jury trial as a protection against arbitrary exercise of official power because "[c]ontemptuous conduct * * * often strikes at the most vulnerable and human qualities of a judge's temperament. Even when the contempt is not a direct insult to the court or the judge, it frequently represents a rejection of judicial authority, or an interference with the judicial process or with the duties of officers of the court." [27] The court concluded

---

21. Bloom v. Illinois, 391 U.S. 194, 196, 88 S.Ct. 1477, 1479, 20 L.Ed.2d 522, 525 (1968). Although the contempt power dates roughly from the 13th century, the requirement of a jury trial was not really forcefully proposed until Justice Black's dissent in Green v. United States, 356 U.S. 165, 78 S.Ct. 632, 2 L.Ed.2d 672, 693–711 (1958).

Art. III, sec. 2 of the United States Constitution provides in part that "[t]he trial of all crimes, except in cases of impeachment, shall be by jury * * *." The Sixth Amendment states that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury * * *." The Fifth Amendment and the Fourteenth Amendment prohibit both the federal government and the states from depriving any person of "life, liberty, or property, without due process of law."

22. Goldfarb, *supra* note 18, at 22–23, 181–83; In re Debs, 158 U.S. 564, 595, 15 S.Ct. 900, 39 L.Ed. 1092, 1106 (1895).

23. 8A J. Moore, Federal Practice ¶ 42.02 [3], at 42–10 (2d Ed. 1970).

24. Simultaneous to its decision in *Bloom*, the Supreme Court decided that the Due Process Clause of the Fourteenth Amendment guarantees the right to jury trial in serious criminal prosecutions in state courts. Duncan v. Louisiana, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968).

25. Bloom v. Illinois, 391 U.S. 194, 198, 88 S.Ct. 1477, 1480, 20 L.Ed.2d 522, 526 (1968).

26. *Id*. 391 U.S. at 201, 88 S.Ct. at 1481, 20 L.Ed.2d at 528.

27. *Id*. 391 U.S. at 202, 88 S.Ct. at 1482, 20 L.Ed.2d at 529. In Duncan v. Louisiana, 391 U.S. 145, 156, 88 S.Ct. 1444, 1451, 20 L.Ed.2d 491, 500 (1968), the court said:

The framers of the constitutions strove to create an independent judiciary but insisted upon further protection against arbitrary action. Providing an accused

that neither its prior decisions nor considerations of necessity and efficiency justified denial of a jury trial in cases of serious criminal contempts.[28]

In according primacy to the individual's right to procedural protections over considerations of necessity, efficiency, and the need to further respect for judges and courts, Justice White stated:

> We place little credence in the notion that the independence of the judiciary hangs on the power to try contempts summarily and are not persuaded that the additional time and expense possibly involved in submitting serious contempts to juries will seriously handicap the effective functioning of the courts. We do not deny that serious punishment must sometimes be imposed for contempt, but we reject the contention that such punishment must be imposed without the right to jury trial. * * * When a serious contempt is at issue, considerations of efficiency must give way to the more fundamental interest of ensuring the even-handed exercise of judicial pow-

er. * * * Perhaps to some extent we sacrifice efficiency, expedition, and economy, but the choice in favor of jury trial has been made, and retained, in the Constitution. We see no sound reason in logic or policy not to apply it in the area of criminal contempt.[29]

Thus, in *Bloom*, the Supreme Court ruled that insofar as the right to jury trial is concerned, criminal contempts were to be treated like other crimes except that nonserious contempts, like petty crimes, need not be tried to a jury.[30] Of particular significance to the case at bar is the Supreme Court's conclusion that a special rule, permitting summary disposition for disorders in the courtroom, was not needed.[31]

We find the reasoning of *Bloom* highly persuasive in regard to its conclusion that the Due Process Clause of the United States Constitution requires that an individual be accorded a jury trial in cases of serious criminal contempts. On the other hand, as a matter of interpretation of Alaska's Constitution, we believe that our decision in *Baker* requires rejection of

> with the right to be tried by a jury of his peers gave him an inestimable safeguard against the corrupt or overzealous prosecutor and against the compliant, biased, or eccentric judge.

28. *Id.* 391 U.S. at 198–199, 88 S.Ct. 1477, 20 L.Ed.2d at 527–528.

29. *Id.* at 208–209, 88 S.Ct. at 1486, 20 L.Ed.2d at 533.

30. *Id.* 391 U.S. at 210, 88 S.Ct. at 1486, 20 L.Ed.2d at 533. Concerning this point, the court said:
> It is old law that the guarantees of jury trial found in Article III and the Sixth Amendment do not apply to petty offenses. * * * Duncan v. Louisiana * * *.

In United States v. Barnett, 376 U.S. 681, 695 n. 12, 84 S.Ct. 984, 992, 12 L.Ed. 2d 23, 33 n. 12 (1964), the majority opinion stated in a footnote that:
> In view of the impending contempt hearing, effective administration of justice requires that this dictum be added: Some members of the Court are of the view that, without regard to the seriousness of the offense, punishment by summary trial without a jury would be

constitutionally limited to that penalty provided for petty offenses.

In *Barnett*, Justice Goldberg advanced for the first time the thesis that criminal contempts were tried without a jury at the time of the adoption of the federal constitution "because they were deemed a species of petty offense punishable by trivial penalties." United States v. Barnett, 376 U.S. 681, 751–752, 84 S.Ct. 984, 1019, 12 L.Ed.2d 23, 65 (1964) (dissent).
*Barnett* was followed by Cheff v. Schnackenberg, 384 U.S. 373, 380, 86 S.Ct. 1523, 1526, 16 L.Ed.2d 629, 634 (1966), where the court held in the exercise of its supervisory powers that "sentences exceeding six months for criminal contempt may not be imposed by federal courts absent a jury trial or waiver thereof." *See also* Dyke v. Taylor Implement Mfg. Co., 391 U.S. 216, 88 S.Ct. 1472, 20 L.Ed.2d 538 (1968).

31. On this point Justice White states: "There is * * * a strong temptation to make exception to the rule we establish today for disorders in the courtroom. We are convinced, however, that no special rule is needed." 391 U.S. at 210, 88 S.Ct. at 1486, 20 L.Ed.2d at 533.

*Bloom's* conclusion that only in cases of serious criminal contempts does the accused contemnor have the right to a jury trial.[32]

Article I, section 11 of the Alaska Constitution provides in part that "[i]n all criminal prosecutions, the accused shall have the right to a speedy and public trial, by an impartial jury * * *."[33] In Roberts v. State, 458 P.2d 340, 342 (Alaska 1969), this court's decision-making role in adjudications involving Alaska's constitutional provisions was explained.[34] While recognizing that we were obliged to enforce national minimal constitutional standards required by the United States Supreme Court's interpretations of the Fourteenth Amendment, we said that it would be an abdication of our constitutional responsibilities to look only to the Supreme Court for guidance.[35] Baker v. City of Fairbanks, 471 P.2d 386, 401–402 (Alaska 1970), contains further elaboration on the subject of our decisional obligations under Alaska's Constitution. In that case we said:

> While we must enforce the minimum constitutional standards imposed upon us by the United States Supreme Court's interpretation of the Fourteenth Amendment, we are free, and we are under a duty, to develop additional constitutional rights and privileges under our Alaska Constitution if we find such fundamental rights and privileges to be within the intention and spirit of our local constitutional language and to be necessary for the kind of civilized life and ordered liberty which is at the core of our constitutional heritage. We need not stand by idly and passively, waiting for constitutional direction from the highest court of the land. Instead, we should be moving concurrently to develop and expound the principles embedded in our constitutional law. (footnotes omitted).

*Baker* presaged our right to jury-trial holding in the case at bar. There the accused had demanded and was denied a jury trial upon charges stemming from an asserted violation of a municipality's assault ordinance. We held that the defendant was entitled to a jury trial. Alaska's constitutional provision relating to the right to jury trial was interpreted to mean that in any criminal prosecution an accused, upon demand, is entitled to a jury trial. We defined the category "criminal" prosecution as "including any offense a direct penalty for which may be incarceration in a jail or penal institution."[36] In reaching this construction, we expressly held that contemporary social values, rather than historical categorizations, should determine whether a prosecution is criminal for purposes of the right to jury trial.[37] In *Baker*, we declined to give Duncan v. Louisiana, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968), a mechanical reading in determining the scope of the petty offense exception to the right to a jury trial guaranteed by the Due Process Clause. We reasoned that this

32. Under our contempt statutes, the maximum sentence which Browder could suffer, and in fact did receive, was six months imprisonment. See AS 09.50.020 which provides in part that "[a] person who is guilty of contempt is punishable by fine of not more than $300 or by imprisonment for not more than six months."

33. Article I, sec. 1 of the Alaska Constitution further provides in part that "all persons are equal and entitled to equal rights, opportunities, and protection under the law * * *." and Article I, sec. 7 of the Alaska Const. guarantees that "[n]o person shall be deprived of life, liberty, or property, without due process of law. * * *"

34. *See also* Glasgow v. State, 469 P.2d 682, 686 (Alaska 1970).

35. We further said in Roberts v. State, 458 P.2d 340, 342 (Alaska 1969), that: We are not bound in expounding the Alaska Constitution's Declaration of Rights by the decisions of the United States Supreme Court, past or future, which expound identical or closely similar provisions of the United States Constitution.

36. Baker v. City of Fairbanks, 471 P.2d 386, 402 (Alaska 1970).

37. *Id.* at 396.

court had independent power to determine which offenses are petty or serious so as to require jury trial.

*Baker* is bottomed on our belief that the right to jury trial holds a central position in the framework of American justice,[38] and our further belief as to the primacy which must be accorded the accused's right to a fair trial against considerations of convenience or expediency to the state.[39] In holding that in any criminal prosecution the accused, upon demand, is entitled to a jury trial, we said in *Baker* that:

> In interpreting the Alaska Constitution we must consider the consequences of denying jury trial to the person being prosecuted. It is of small moment to the citizen whether the period of incarceration is long or short * * *. Punishments inflicted at that level can be as harsh and as devastating to the life of the citizen as those meted out for more serious misdemeanors and for felonious conduct. Why should the remedial process be less just at one level than at another? We should be alert against attempts by government to whittle away fundamental rights on grounds of expediency. It is our constitutional duty to prevent such untoward consequences for the citizen at large.[40]

■ We hold that direct criminal contempts must be treated like any other criminal prosecution for purposes of the right to jury trial under article I, section 11 of the Alaska Constitution. Direct criminal contempts meet every facet of *Baker's* definition of the category of "criminal prosecutions" and underlying policy reasons for honoring Alaska's constitutional guarantee to a right to jury trial. Under AS 09.50.020 the contemnor may be incarcerated in a jail or penal institution for six months.[41] Thus, it is clear that a criminal contempt proceeding is criminal prosecution within article I, section 11 of the Alaska Constitution. In the instant case, we believe that considerations of convenience and expediency to the state are convincingly outweighed by the right of an individual to be convicted only by means which are fundamentally fair. We therefore hold, in accordance with *Baker*, that article I, section 11 of the Alaska Constitution guarantees the accused the right to jury trial for a direct criminal contempt.[42]

Not only do we think that the plain meaning and spirit of *Baker* requires rejection of *Bloom's* denial of the right of jury trial in non-serious cases of criminal contempt, but we are also convinced that analysis of the premises upon which the power to sum-

38. "Trial by jury is one of the oldest discernible and distinguishing institutions of our Anglo-American system of jurisprudence." *Id.* at 396.

39. "Substantial reasons of policy must play an important part in any disposition of this problem. These naturally divide themselves into two major groups. On the one hand, we have considerations of convenience or expediency for the state and its legal subdivisions. It imposes a certain burden upon the machinery of government to make every offense triable by jury. * * * Balanced against the need to allow government to operate as unencumbered as possible is the right of an accused to be convicted, if at all, only by means which are fair." *Id.* at 394.

40. *Id.* at 401.

41. Browder could also have been indicted for the felony offense of obstructing the

administration of justice under AS 11.30.320. Upon conviction, he could have received a maximum punishment of a fine of $5,000 and 5 years' imprisonment.

42. The case at bar was on direct appeal to the superior court at the time our decision in *Baker* was handed down. In *Fresneda v. State*, 458 P.2d 134, 143 n. 28 (Alaska 1969), the Supreme Court of the United States' decision in *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685, 694 (1969), which articulated new standards governing warrantless searches incident to lawful arrests, were made applicable to cases pending on direct review in this court as of the date of the *Chimel* decision. This aspect of our decision in *Fresneda* was recently followed in Robinson v. State, 484 P.2d 686 (Alaska, 1971).

marily imprison for criminal contempt indicates that no exception to the right to jury trial should be made for petty contempts where imprisonment is a potential sanction.

It was mentioned earlier that it has long been thought that the power to punish summarily for contempt is necessary for the preservation of the dignity, authority, and effectiveness of the courts, and to engender respect for judges and the courts.[43] The major premise behind this reasoning is that such goals can be secured only through fear of punishment by the state. The necessity for retention of this fear-based premise is eloquently refuted by Justice White in Bloom v. Illinois, where he states:

> We cannot say that the need to further respect for judges and courts is entitled to more consideration than the interest of the individual not to be subjected to serious criminal punishment without the benefit of all the procedural protections worked out carefully over the years and deemed fundamental to our system of justice. Genuine respect, which alone can lend true dignity to our judicial establishment, will be engendered, not by the fear of unlimited authority, but by the firm administration of the law through those institutionalized procedures which have been worked out over the centuries.[44]

We think the goals of preservation of the authority and effectiveness of the judicial process are obtainable by means other than the use of the extraordinary power to imprison summarily for contempt. Even without this drastic power, our trial courts may summarily impose a fine of up to $100 for various types of contempt, including "any * * * unlawful interference with the process or proceedings of the court."[45]

---

43. Civ.R. 90(a) is reflective of this traditional approach.
   One author writes:
   The contempt power is understandable when seen through the perspectives of its age of inception, an age of allegedly divinely ordained monarchies, ruled by a king totally invested with all sovereign legal powers and accountable only to God. Under any circumstances resistance to the king was a sin which would bring damnation.
   * * * Yet, it takes some straining of reason to include the contempt power within the best characteristics of Anglo-American, freedom-conscious law. And even assuming the value of this power device in a legal system such as ours, it is still another question whether it ought to be exercised in the procedural manner or to the quantitative extent that it is now.
   R. Goldfarb, The Contempt Power 3, 11–12 (1963).

44. Bloom v. Illinois, 391 U.S. 194, 208, 88 S.Ct. 1477, 1486, 20 L.Ed.2d 522, 532–533 (1968).

45. Under AS 12.80.010 it is provided that "The provisions of the Code of Civil Procedure (AS 09.50.010–09.50.060) relating to contempt shall apply in criminal actions."
   Under the provisions of AS 09.50.010 and AS 09.50.020, only the following contempts are punishable by imprisonment:

   (1) disorderly, contemptuous, or insolent behavior toward the judge while holding the court, tending to impair its authority or to interrupt the course of a trial or other judicial proceeding;

   (2) a breach of the peace, boisterous conduct, or violent disturbance, tending to interrupt the course of a trial or other judicial proceeding * * *.

   These are the only contempts punishable by imprisonment, and therefore under Baker must be tried by jury, for AS 09.50.020 provides:

   A person who is guilty of contempt is punishable by fine of not more than $300 or by imprisonment for not more than six months. However, when the contempt is one mentioned in § 10(3)–(12) of this chapter, or in an action before a deputy magistrate, the person is punishable by a fine of not more than $100 unless it appears that a right or remedy of a party to an action or proceeding was defeated or prejudiced by the contempt, in which case the penalty shall be as prescribed for contempts described in § 10(1) and (2) of this chapter.

   Thus, it is possible in the case of minor direct contempts summarily to impose a fine because under AS 09.50.020 incarceration is not a potential sanction for a contempt within AS 09.50.010(9), which defines a contempt as "any other

The court has the authority to cite for criminal contempt (i. e., to bind the alleged contemnor over for trial) on its authority alone. The court may order a contumacious defendant to be taken from the courtroom.[46] Unruly spectators may, in addition to summary fine or citation, be ordered from the courtroom. The court retains the authority to imprison for civil contempt in appropriate instances. Each of these powers involves one degree or another of punishment; in each case the trial court acts summarily. It is thus clear that our trial courts will not be rendered impotent if denied the power summarily to imprison for most direct criminal contempts.[47]

■ We therefore think that Judge Lewis's ruling that Browder was entitled to a jury trial under Alaska's Constitution on the question of whether he was guilty of contumacious conduct should be affirmed.[48] In our view, this holding is in harmony with the rationale of *Baker* and is reflective of the central position we believe the right to jury trial holds in our system of criminal justice. We think fundamental fairness requires that no one individual should be permitted to act as prosecutor, trier of fact, and judge in the same proceeding. Neither reason nor logic has persuaded us that this anomalous summary power to imprison for contempt is to be found "within the intention and spirit of our local constitutional language." Rather, we find that a right to jury trial in a direct criminal contempt situation is "necessary for the kind of civilized life and ordered liberty which is at the core of our constitutional heritage." We therefore hold that Browder is entitled

---

unlawful interference with the process or proceedings of the court."

46. In Illinois v. Allen, 397 U.S. 337, 343, 90 S.Ct. 1057, 1061, 25 L.Ed.2d 353, 359 (1970), the Supreme Court dealt with the question of the obstreperous defendant. In writing for the court Mr. Justice Black said in part:

It is essential to the proper administration of criminal justice that dignity, order, and decorum be the hallmarks of all court proceedings in our country. * * * No one formula for maintaining the appropriate courtroom atmosphere will be best in all situations.

In *Allen*, the Court held that the defendant could be cited for contempt, taken out of the courtroom until he promises to conduct himself properly, or as a last resort he could be bound and gagged.

*See also* Mayberry v. Pennsylvania, 400 U.S. 455, 91 S.Ct. 499, 505, 27 L.Ed.2d 532, 538–540 (1971). In that case the Supreme Court said in part:

Our conclusion is that by reason of the Due Process Clause of the Fourteenth Amendment a defendant in criminal contempt proceedings should be given a public trial before a judge other than the one reviled by the contemnor.

A civil contempt is said to be a willful failure to do something ordered by the court (or the doing of something forbidden by the court) for the benefit or advantage of another party to the proceeding before the court. Typically the contemnor is ordered to jail until he complies with the court's order, or to pay a fine—sometimes to the aggrieved party—

unless he complies. In this way, it is said that "he carries the keys to jail in his own pocket"—thus, he can purge himself.

47. Under Bloom, the power summarily to punish direct criminal contempts is limited to petty offenses. Thus, for serious direct contempts, the power to punish summarily is withheld in favor of the individual's rights to constitutional safeguards. All of which indicates the diminished importance of the power to punish summarily.

We find it unnecessary to consider in any detail the inherent power of courts to punish summarily for contempt. The inherent power doctrine has been employed by courts as a device for justifying their exercise of contempt power in the absence of statutory or other authorization to punish contempts summarily. Of necessity, it is the function of the highest court of the jurisdiction to define the limits of this power, and the perimeters of this power are fully bounded by our present decision.

48. In his concurring opinion in Mayberry v. Pennsylvania, 400 U.S. 455, 91 S.Ct. 499, 506, 27 L.Ed.2d 532, 541 (1971), Chief Justice Burger said in part:

The contempt power, however, is of limited utility in dealing with an incorrigible, a cunning psychopath, or an accused bent on frustrating the particular trial or undermining the processes of justice. For such as these, summary removal from the courtroom is the really effective remedy.

to a jury trial on the question of whether he committed a criminal contempt. We further hold that under article I, section 11 [49] of Alaska's Constitution Browder is entitled to have the assistance of counsel in defense of this charge.[49a]

### WHETHER JUDGE BREWER SAT AS A STATE JUDGE IN A STATE COURT POSSESSED OF THE POWER TO PUNISH FOR CONTEMPT.

Browder in his cross-petition argues that on the occasion in question Judge Brewer sat as a city judge and was not endowed with the power to cite for contempt. Browder reaches this conclusion by process of the following reasoning: Anchorage is a home rule city and under Article X, Section 7 of the Alaska Constitution it is provided that "Cities shall have the powers and functions conferred by law or charter." In Lien v. City of Ketchikan, 383 P.2d 721, 723 (Alaska 1963), this court construed this constitutional provision to mean

> that where a home rule city is concerned the charter, and not a legislative act, is looked to in order to determine whether a particular power has been conferred upon the city.

When one looks to the charter, it can be seen that it does in fact set up a court system. Section 8 of the appendix to the charter of the city of Anchorage, Alaska, provides in part that:

> The magistrate's court, as established on the effective date of this charter, shall continue to be the Magistrate's Court of the city.

Browder further reasons that neither the constitution of Alaska nor any legislative enactment prohibits the creation of courts by a municipal corporation under a home rule charter.[50] Browder concludes his argument by pointing to the fact that no ordinance nor charter provision vested the contempt power in the Anchorage city magistrate's court.

The state on the other hand argues that the superior court correctly ruled that a home rule municipality is precluded from establishing its own court system by virtue of the provisions of Article IV, Section 1 of the Alaska Constitution. It is the state's contention that Article IV, Section 1 vests the judicial power of the state in a unified state court system.[51] The state further argues that the charter of the city of Anchorage does in fact grant contempt powers to the court when hearing municipal matters.[52] Here the state relies upon the pro-

49. Art. I, sec. 11 of the Alaska Const. provides that in all criminal prosecutions the accused is entitled to have the assistance of counsel for his defense. We do not decide in this case whether an indigent misdemeanant is entitled to have the state or its political subdivisions provide counsel. All we need decide is that Browder is entitled to have the assistance of counsel in the case at bar.

49a. We think it advisable that our Standing Advisory Committees on both Civil and Criminal Rules of Procedure study the ABA Project on Minimum Standards for Criminal Justice, Standards Relating to the Judge's Role in Dealing with Trial Disruptions, (Tentative Draft May 1971), with a view toward proposing appropriate rule changes concerning contempt procedures.

50. The provisions of art. IV, sec. 1 and art. X, sec. 11 furnish the background

against which this argument is made. The former provision of our constitution states in part that "The judicial power of the State is vested in a supreme court, a superior court, and the courts established by the legislature." Article X, sec. 11 provides that "A home rule borough or city may exercise all legislative powers not prohibited by law or by charter."

51. In support of this assertion, the state points to the fact that under AS 22.15.-060(a) the legislature vested district courts with criminal jurisdiction over violation of an ordinance of a political subdivision.

52. The state also argues that the city of Anchorage in fact did not set up a separate court system but merely contracted for state judicial services. The state also advances the further contention that all courts are clothed with inherent power to punish summarily direct contempts.

visions of section 8 of the appendix to the charter of the city of Anchorage which provides:

> The magistrate court, as established on the effective date of this charter, shall continue to be the Magistrate's Court of the city. It shall have all the powers and jurisdiction conferred upon the court by law and shall continue to exercise such powers and jurisdiction until superseded by law.

Chapter 1, section 1.5(g) of the charter of the city of Anchorage defines the term "by law" to be "applicable federal law, the Constitution and statutes of Alaska, the applicable common law, and this charter." Since AS 09.50.010 confers contempt powers on the courts of Alaska, that power, the state contends, exists in the court of the municipal division by virtue of the provisions of section 8 of the appendix to the charter of the city of Anchorage.

█ Assuming, without deciding, that Browder's analysis is correct, and that it is constitutionally permissible for a municipality to create its own court system, we are in agreement with the state's analysis of the question and hold that section 8 of the

appendix to the charter of the city of Anchorage authorized Judge Brewer to punish contempts pursuant to state law.[53]

## WHETHER WILLFULNESS IS A REQUISITE ELEMENT OF DIRECT CRIMINAL CONTEMPT.

█ AS 09.50.010 sets forth certain acts and omissions which constitute contempt. The statute provides in part that:

> The following acts or omissions in respect to a court of justice or court proceedings are contempts of the authority of the court:
>
> (1) disorderly, contemptuous, or insolent behavior toward the judge while holding the court, tending to impair its authority or to interrupt the course of a trial or other judicial proceeding.[54]

This portion of Alaska's contempt laws furnished the basis for Judge Brewer's adjudication of contempt. For in his cer-

---

53. Since the offense is created by state law, state law should govern regarding the applicable penalties.

54. Other acts or omissions which constitute contempt of court under AS 09.50.-010 are:

(2) a breach of the peace, boisterous conduct, or violent disturbance, tending to interrupt the course of a trial or other judicial proceeding;

(3) misbehavior in office, or other willful neglect or violation of duty by an attorney, clerk, peace officer, or other person appointed or elected to perform a judicial or ministerial service;

(4) deceit or abuse of the process or proceedings of the court by a party to an action or proceeding;

(5) disobedience of a lawful judgment, order, or process of the court;

(6) falsely pretending to act under authority of an order or process of the court;

(7) rescuing a person or property in the custody of an officer by virtue of an order or process of the court;

(8) unlawfully detaining a witness or party to an action or proceeding while going to, remaining at, or returning from the court where the witness or party is for trial;

(9) any other unlawful interference with the process or proceedings of the court;

(10) disobedience of a subpoena duly served, or refusing to be sworn or answer as a witness;

(11) when summoned as a juror in a court, neglecting to attend or serve, or improperly conversing with a party to an action or proceeding to be tried at the court or with another person in relation to the merits of the action, or receiving a communication from a party or other person in respect to it without immediately disclosing it to the court;

(12) disobedience by an inferior court, magistrate, referee, master, or officer of the lawful judgment, order, or process of a higher court, or proceeding in an action or proceeding contrary to law after the action or proceeding is removed from the jurisdiction of that inferior court, magistrate, or officer.

tificate of contempt,[55] Judge Brewer states in part that:

I queried the defendant as to his actions and thereupon found his actions contemptuous of the court's authority, dignity, and decorum and tending to disrupt the proceedings therein;

That I found the defendant in contempt of court under AS 09.50.010 and sentenced him to six months in jail therefore under AS 09.50.020, after having advised the defendant of his rights and after reading both statutes into the record and explaining them to him.[56]

The issue is one of first impression since no Alaska state cases are directly in point.[57] Taylor v. District Court, 434 P.2d 679, 681 (Alaska 1967), relied upon by Browder, involves an indirect contempt of court. *Taylor* involved an attorney who failed to appear in the district court for trial. This court held that "willful disregard or disobedience of the authority or orders of the court" was a necessary element of indirect contempt. A number of territorial cases which have considered the question uniformily hold, or proceed on the assumption, that intent or willfulness is a necessary element for direct criminal contempt. In In re Stabler, 7 Alaska 186, 187, 190–191 (1924), an Assistant United States Attorney had made remarks challenging the honesty and integrity of the court. Appeal from conviction of contempt was based partly on the ground that there had been no contempt because none had been intended. Although the appellate court found that the language used by the attorney was questionable, it reversed the conviction on the grounds of lack of intent appearing from the record:

Had the order stated that the remarks were made with an intention to cast reflections on the integrity of the court, * * * the order then might have been sufficient.

This action is in the nature of a criminal action, and, according to the authorities, the construction placed on words used * * * should be favorable to the defendant.

* * * There is no finding that the remarks were made otherwise than respectfully or properly, or with an intention to reflect upon or give offense to the judge of the court.

Paul v. United States, 36 F.2d 639 (9th Cir. 1929), involved a summary contempt conviction of a lawyer who had filed an affidavit the trial court believed contained false allegations. The Ninth Circuit reversed his conviction finding that Paul had acted in good faith (i. e., that he had not entertained an intent to make a false affidavit). In Tjosevig v. United States, 255 F. 5 (9th Cir. 1919), both an attorney and his client were cited for contempt as a result of an attempt to obtain a change of venue on the grounds that the trial judge was prejudiced. The Ninth Circuit considered two defenses, one of which was that the facts did not indicate the intention of the accused to commit a contempt. The court upheld this defense, finding that the attempt to change venue was a good faith attempt on the part of the attorney to protect the rights of his client. It is apparent that these territorial cases furnish Alaskan precedent for the proposition that willfulness is a required element of direct contempt. We believe this territorial view is reflective of sound jurisprudence and merits retention. Our study of the authorities on both sides of this issue has left us with a firm conviction as to the efficacy of maintaining willfulness as a requisite element of direct criminal contempt. The soundness

---

55. Civ.R. 90(a) provides:
  A contempt may be punished summarily if the judge certifies that he saw or heard the conduct constituting the contempt and that it was committed in the actual presence of the court. The order of contempt shall recite the facts and shall be signed by the judge and entered of record.
  *Compare* Fed.R.Crim.P. 42(a).

56. AS 09.50.020 reads in part that "A person who is guilty of contempt is punishable by fine of not more than $300 or by imprisonment for not more than six months."

57. Our contempt laws were adopted from the laws of the State of Oregon. We have not been cited to, nor found, any controlling Oregon precedent on the question of willfulness.

of such a requirement is vividly demonstrated in the case at bar.

The record in the case at bar reveals an ambiguous factual setting which is susceptible of varying interpretations.[58] In such circumstances we deem it highly appropriate that the judge, if the matter is tried to the court without jury, in his certificate be required to make a finding that the conduct constituting the contempt was willful, or if the matter is tried to a jury that it be proven the accused was willfully contumacious.[59] We use "willfully" here in the sense that an act is done willfully if done voluntarily and intentionally, that is, with the intent to disobey or disregard the law.

The superior court's judgment reversing Browder's contempt conviction and remanding the matter to the district court for trial by jury is affirmed.

BONEY, Chief Justice (concurring).

I am in agreement with the result achieved by the majority in this case. I join in all of the opinion except for portions of the discussion on the right to jury trial in all direct contempt cases where imprisonment is a possible punishment.

In my opinion, the majority has proceeded to expand the right of a jury trial by giving our decision in Baker v. City of Fairbanks, 471 P.2d 386 (Alaska 1970) an overbroad application when it was unnecessary to do so in deciding this case. Now petty direct contempts may be tried before a jury even when a sentence as little as one day in jail is imposed.

The majority opinion does not clearly answer the question as to whether a judge might impose a fine for direct contempt without a jury trial. Certainly this court should deal with this question. Otherwise it must be assumed that a court has no power to punish direct contempt without affording a jury trial. In fairness to the judiciary of this state, this court should state precisely what, if anything, is left of the summary contempt power.

The opinion does not deal with the question of whether the judge has inherent power to summarily punish direct contempts. I consider this a major flaw in the court's opinion. It seems to rely only on statutory authority to punish contempts. If courts still have some inherent authority in this area then the opinion should state its extent.

If *Baker* is to be read literally as is indicated by the majority, a jury trial would be permissible in all criminal contempt cases because our contempt statute provides a maximum fine of $300.00 or imprisonment for no more than six months.[1] In determining the right to jury trial, under the *Baker* rationale, we would look to the possible sentence rather than the one actually imposed. The court should state whether it follows the *Baker* approach or not.

In my opinion, Browder was certainly entitled to a jury trial under article I, section 11 of the Alaska Constitution. However, my approach differs from that of the majority in that I would look at the sentence actually imposed by the trial judge in determining whether the contempt was serious or petty. I believe the trial judge has inherent power to summarily punish contempts occurring in his presence by imposing minimal sanctions. These sanctions would include a fine and a jail sentence. For example, I do not believe a fine of at least $100.00 and a five day jail sentence would make a contempt a serious one warranting trial by jury. There is no need at this time for me to precisely draw a line between petty and serious contempts as this is not the opinion of this court. In this case, the trial judge summarily imposed a six-months jail sen-

58. There is a suggestion in the state's brief that Browder's acts might have been found non-contumacious if they had been committed by a different looking person.

59. *See* Justice Goldberg's dissent in United States v. Barnett, 376 U.S. 681, 756, 84 S.Ct. 984, 12 L.Ed.2d 23, 67 (1964); United States v. De Simone, 267 F.2d 741, 745 (2nd Cir.), cert. denied, 361 U.S. 827, 80 S.Ct. 74, 4 L.Ed.2d 70 (1959); United States v. Thompson, 214 F.2d 545 (2d Cir. 1954); United States v. Goldfine, 169 F.Supp. 93 (D.C.Mass. 1958); R. Goldfarb, The Contempt Power 55 (1963).

1. AS 09.50.020.

tence. This indicates the seriousness of the alleged contempt. On balance, the court's summary power must give way to Browder's rights to the procedural safeguards which are incident to any conventional criminal proceeding of a serious nature.

The United States Supreme Court in *Bloom v. Illinois*, 391 U.S. 194, 88 S.Ct. 1477, 20 L.Ed.2d 522 (1968) said that criminal contempt is a, petty offense unless severe punishment makes it a serious one. In *Bloom*, the court held that the Sixth Amendment guaranteed a jury trial in serious contempts prosecuted in state courts for the reason that there were no substantial differences between serious contempts and serious crimes. The federal definition of a serious crime in contempt cases is one in which a sentence of more than six months is imposed.[2] Needless to say, we should not blindly adopt the federal definition in interpreting our constitution. However, we should draw a line which is reasonable and which is in accord with our constitutional history.

It is my view that the majority has mechanically applied the *Baker* tests of determining what is a serious crime to criminal contempt cases. I believe such an approach is somewhat erroneous in that it ignores the historical basis of the *Baker* decision and the evil it was designed to correct. *Baker* guaranteed jury trials for the first time since statehood for prosecutions of serious offenses prosecuted under municipal ordinances. The court was influenced in its decision by the territorial practice of granting jury trials in all criminal cases.[3] Significantly, though, it was never the practice to grant jury trials in direct contempt proceedings in territorial days. The question of granting jury trials in direct contempt proceedings was not even considered by the court in *Baker*. A wise rule in a conventional criminal case may become an absurdity when applied to a summary contempt proceeding. The differences between the two types of proceedings are readily apparent. These differences are attested to by the historical separation of the two categories of offense. Convictions of a petty criminal contempt differ significantly from convictions of a conventional crime in terms of the opprobrium which will be attached thereto by society. A conventional crime is an offense against the state and its people, while a criminal contempt is more narrowly an offense against the dignity of the court. In my view, the differences between these two categories of offense may not be wholly disregarded. I am not as confident as my brothers are that the courts still have adequate means available to maintain order and decorum in the courtroom. No longer will the courts of this state be able to summarily punish contemptuous conduct in an effort to maintain orderly judicial processes. Hopefully, the rule announced by the majority today will not render the courts impotent to deal with those who will disrupt court proceedings.

There is no reason why the courts of this state should not be able to punish petty contempt summarily. The Constitution of the United States does not prohibit such action. In my opinion, the broad interpretation given to the Alaska Constitution's jury trial provision is unwarranted and was not commanded by the *Baker* decision. Obviously, the majority is fearful of the arbitrary abuse of judicial power. Needless to say,

2. Cheff v. Schnackenberg, 384 U.S. 373, 86 S.Ct. 1523, 16 L.Ed.2d 629 (1966).

3. In Baker v. City of Fairbanks, 471 P. 2d 386, 399–401 (1970), we stated:

    The framers of our constitution had a background of actual experience in which the jury trial had been available in criminal cases on a broad basis. First, a broad right to jury trial obtained in prosecutions for any offense under territorial law. Second, some municipalities had provided for jury trial, on demand; and while other municipalities had not so provided, the question of the entitlement to jury trial had never been tested through an appellate proceeding during territorial times. * * *

    If, historically, jury trial had always been available on a broad basis in Alaska, it is only reasonable to conclude that the framers thought they were continuing an existing practice. This may account for the lack of discussion on the convention floor about the petty offense exception. (Footnotes omitted.)

such abuse can be dealt with in other ways. As an example, this court in the exercise of its rule making power could provide for procedures which could insure greater protection for those cited for contempt. This would be preferable to making an unwise constitutional decision. In this case, the cure may be worse than the disease.

ERWIN, Justice (concurring).

I concur in the Court's opinion and add these additional observations chiefly for exampled-tcagrten cmfwyp fwypwwwww emphasis.

One possible criticism of the present opinion will be based upon the historical precedent which permitted summary contempt in all cases. However, in Bloom v. Illinois,[1] the United States Supreme Court undertook a review of the historical antecedents of the law of summary contempt, and found reliance thereon to support the summary power debatable in the early English courts:

> Learned writers have interpreted Fox's work as showing that until the late 17th or early 18th centuries, apart from the extraordinary proceedings of the Star Chamber, English courts neither had, nor claimed, power to punish contempts, whether in or out of court, by summary process. * * *[2]

Thus, historical precedent alone is not sufficient to exempt criminal contempt from constitutional guarantees. Moreover, as Justice White points out, "the ultimate question is not whether the traditional doctrine is historically correct but whether the rule that criminal contempts are never entitled to a jury trial is a necessary or an acceptable construction of the Constitution."[3]

Nevertheless, I wish also to emphasize the indispensable necessity of maintaining in courtrooms that atmosphere of quiet orderliness so crucial to our adversary process. Therefore, I feel compelled to review the alternatives short of criminal contempt which are available to trial judges in coping with disruptive courtroom tactics.[4]

Civil contempt is always available and should be used without hesitation where necessary. However, civil contempt power may be of limited utility in dealing with an incorrigible, a psychopath, or an accused bent on frustrating his trial. There are other means to cope with grave misconduct in the courtroom, whether that of the accused, his counsel, spectators, or others.

In every criminal trial there is more at stake than just the interest of the accused; the integrity of the process itself warrants a trial judge exercising his discretion to have counsel participating in the defense even when counsel is rejected by the defendant. A criminal trial is not à private matter; the public interest is so great that the presence and participation of counsel, even when opposed by the accused, is necessary in order to vindicate the process itself.

On the other side of the coin, the actions of an attorney which are calculated to disrupt the trial process must be similarly treated. The court has the power to summarily bar the attorney from the courtroom and to remove him from the representation of his client in the matter before the court. Additional sanctions for violation of the Canons of Professional Ethics are of obvious appropriateness.

Finally, there is a class of extremely petty contempts (where punishment is an appropriate fine) for isolated breaches of courtroom decorum not foreclosed by this case or by Baker v. City of Fairbanks.[5]

---

1. 391 U.S. 194, 88 S.Ct. 1477, 20 L.Ed. 2d 522 (1968).

2. *Id.* at 198 n. 2, 88 S.Ct. at 1481, 20 L.Ed.2d at 527 n. 2.

3. *Id.* at 200 n. 2, 88 S.Ct. at 1481, 20 L.Ed.2d at 528 n. 2.

4. The Supreme Court of the United States, in Illinois v. Allen, 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970), charted

the courses which are open to trial judges, and the American Bar Association Project on Standards for Criminal Justice, "The Judge's Role in Dealing with Trial Disruption" (Tentative Draft, May, 1971), has suggested the proper application of the various suggestions to maintain proper decorum.

5. 471 P.2d 386, 402 (Alaska 1970).